IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| PAULA FRANKLIN and HALEIGH LOWERY, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO. 2:16-cv-206-GMB ) [WO] |
| DAVID HUBBARD and CHILTON COUNTY BOARD OF EDUCATION, | ) ) ) |
| Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiffs Paula Franklin and Haleigh Lowery filed this lawsuit on March 28, 2016, asserting a number of claims arising out of Defendant David Hubbard's alleged sexual abuse of both plaintiffs when they were minors. Pending before the court is the Motion for Summary Judgment filed by Defendant Chilton County Board of Education (the "Board"). Doc. 64. The parties have consented to jurisdiction in this court pursuant to 28 U.S.C. § 636(c). After careful consideration of the parties' submissions, the applicable law, and the record as a whole, it is ORDERED that the Motion for Summary Judgment (Doc. 64) is GRANTED, and all claims asserted against the Chilton County Board of Education are DISMISSED with prejudice.

### **I. JURISDICTION AND VENUE**

The court has subject-matter jurisdiction over the claims in this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1367. The defendants do not contest personal jurisdiction or venue, and the court finds adequate allegations to support both.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Lowery attended Chilton County High School in Clanton, Alabama, until her graduation in May 2013. Doc. 64-2 at 20. She first met Defendant David Hubbard in the fall of 2011, shortly after she turned 16 years old. Doc. 64-2 at 4. At the time, and at all other times relevant to this lawsuit, Hubbard was employed as a deputy sheriff by the Chilton County Sheriff's Office. Doc. 64-4 at 18. As a deputy sheriff, Hubbard served as a Community Relations Officer at Chilton County High School as well as several other schools in Chilton County. Doc. 64-4 at 18. In this role, Hubbard was not directly employed by the Board.[1] Doc. 64-4 at 8 & 18. The Board did employ Hubbard, however, beginning on July 17, 2013, as a part-time "law enforcement credentialed instructor" at LeCroy Career Technical Center ("LeCroy") for the 2013–2014 school year. Doc. 64-4 at 8. He resigned from that position one year later on July 16, 2014. Doc. 64-4 at 8.

Lowery and Hubbard met on Facebook and exchanged cell phone numbers after about a week of swapping Facebook messages. Doc. 64-2 at 5. Less than one week after exchanging phone numbers, the conversations between Lowery and Hubbard became sexual in nature. Doc. 64-2 at 5. Lowery had not previously interacted with Hubbard at Chilton County High School and does not know how or why he located her on Facebook. Doc. 64-2 at 6. Less than two weeks after they began messaging, Lowery told Hubbard

---

[1] The plaintiffs contend that Hubbard was employed by the Board "at all times relevant to the Complaint," citing to the deposition of Willie Mae White. Doc. 67 at 1. White's testimony establishes only that the Board employed Hubbard from July 2013 to July 2014. Doc. 64-4 at 8 & 18. The plaintiffs have not produced evidence that the Board employed Hubbard at any other time.

that she wanted to meet in person. Doc. 64-2 at 6. Hubbard then asked if he could come to her home, and she agreed. Doc. 64-2 at 6. Hubbard visited Lowery when she was home sick from school, and they had sexual intercourse. Doc. 64-2 at 7. After this encounter, Lowery and Hubbard continued to text message each other and met in person several times. Doc. 64-2 at 7. Lowery later learned that Hubbard was a police officer and worked at her school as a Community Relations Officer. Doc. 64-2 at 6–7. At some point thereafter, Lowery saw Hubbard at her school conducting a drug interdiction with other officers. Doc. 64-2 at 7–8. Lowery did not tell anyone about her interactions with Hubbard except for her friend, Paula Franklin.[2] Doc. 64-2 at 8. Lowery told Franklin not as "a cry for help or bragging," but because she "wanted to have a friend to talk to about it." Doc. 64-2 at 9. Franklin told her mother, Misty Franklin, about Lowery's relationship with Hubbard. Doc. 64-2 at 9.

In January 2012, on the day Lowery told Franklin about Hubbard, the two girls saw him at a store. Doc. 64-2 at 9–10. Lowery pointed out Hubbard and said, "That's who I've been having sex with." Doc. 64-2 at 10. Later that day, Lowery and Hubbard had sex at LeCroy. Doc. 64-2 at 10. This encounter was the only occasion other than the drug interdiction during which she saw Hubbard on a school campus, including at Chilton County High School. Doc. 64-2 at 11. Lowery and Hubbard also met at his home and at a park in Chilton County. Doc. 64-2 at 13. Lowery did not tell any school system officials about her encounters with Hubbard. Doc. 64-2 at 12–13. She estimates that she stopped

---

[2] Lowery believes this happened in January 2012, but does not remember how long she had been seeing Hubbard at that point. Doc. 64-2 at 8 & 16.

3

seeing Hubbard sometime in the spring or summer of 2012. Doc. 64-2 at 15. Lowery and Hubbard had sexual relations approximately five times in total. Doc. 64-2 at 21.

Franklin had her own relationship with Hubbard. She first met him when he responded to a domestic violence call at her home on December 26, 2011, during which Franklin's grandmother was injured. Doc. 64-1 at 9–10. Franklin was 13 years old at the time and homeschooled. Doc. 64-1 at 15 & 37. Hubbard drove her to the hospital after her grandmother was transported there in an ambulance. Doc. 64-1 at 10. While in his squad car, Hubbard gave Franklin his phone number and told her to give it to her mother so that he could "check on" Franklin, her mother, and her grandmother. Doc. 64-1 at 10. The next month, January 2012, Hubbard text messaged Franklin explaining that he wanted her to come to his home to meet his stepdaughter, who did not have many friends. Doc. 64-1 at 14. Franklin agreed and spent the night at Hubbard's home with his wife, son, stepson, nephew, and stepdaughter all at the home. Doc. 64-1 at 14–15. Hubbard got permission for Franklin to stay over from her mother, Misty Franklin, who knew Hubbard from high school and thought he would be a good influence on her daughter since he was a police officer. Doc. 64-1 at 14.

Both Franklin and her mother stayed in touch with Hubbard throughout the following months, and Franklin estimates that she stayed at his home at least six times in 2012. Doc. 64-1 at 15. However, Franklin stopped going in May 2013 because Hubbard text messaged her that he "loved" her and "wanted to marry" her. Doc. 64-1 at 15–16. He also told Franklin that he wanted to have a "threesome" with her and his wife. Doc. 64-1 at 21. Franklin told her mother, who spoke to Sheriff Kevin Davis about the text messages.

Doc. 64-1 at 16–17. Davis had officer Ken Harmon contact Franklin about the text messages in June or July 2013. Doc. 64-1 at 17. Harmon and another officer told Franklin that she "would have to become a victim before they could do anything about it" and that she was "an F-ing liar." Doc. 64-1 at 17. They believed she was lying because they directed Franklin to text Hubbard while they were with her and he and his wife replied, separately, "Who is this?" Doc. 64-1 at 17. She started returning to Hubbard's home in December 2013 and he apologized, saying that he "didn't mean any of those things" and "looked at [Franklin] like [she] was one of his kids too." Doc. 64-1 at 18. According to Franklin, she returned because she was "friends with his stepdaughter, Leah, and I didn't think anything about it. I was young; I didn't—I was influenced by adults that I shouldn't have been influenced by." Doc. 64-1 at 28. Misty Franklin allowed her daughter to return to Hubbard's home because she believed he was remorseful and had made several improvements, including volunteering for a church. Doc. 64-3 at 12–13.

After Franklin started returning to Hubbard's home in December 2013, he began sending her text messages stating that he wanted to have sex with her. Doc. 64-1 at 29. These messages were often sent while Franklin was actually in the home. Doc. 64-1 at 29. Hubbard's wife also sent messages to Franklin that "[t]hey wanted to have a threesome and to come to the bedroom." Doc. 64-1 at 29. Hubbard and his wife also provided Franklin with alcohol. Doc. 64-1 at 30. On one occasion, while Franklin was intoxicated, Hubbard, his wife, and Franklin had sex together in the Hubbards' bedroom. Doc. 64-1 at 30. This occurred at least two more times. Doc. 64-1 at 30. Hubbard's wife "pressured" Franklin into consuming alcohol by stating "here, you need this" and giving her shots of rum. Doc.

5

64-1 at 30–31. These encounters began in December 2013 and continued to February 2014.[3] Doc. 64-1 at 32 & 34.

In July 2014, another minor to whom the Hubbards had supplied alcohol was in a serious car accident. Doc. 64-1 at 34–36. A police investigation ensued and officers learned that the Hubbards had been in contact with Franklin. Doc. 64-1 at 34–36. On July 25, an investigator interviewed Franklin about her involvement with the Hubbards. Doc. 64-1 at 32. Prior to her conversation with the investigator, Franklin had not told anyone about the sexual abuse. Doc. 64-1 at 36. Once she was approached by the investigator, Franklin revealed the abuse to her mother, to her boyfriend, and to Lowery. Doc. 64-1 at 36. Franklin was homeschooled for the entire extent of her interactions with Hubbard and never saw him on school grounds except when she attended eighth grade for roughly two weeks at Isabella High School. Doc. 64-1 at 37. She did not interact with Hubbard at the school, but saw him conduct drug safety presentations. Doc. 64-1 at 37.

Misty Franklin confirmed that Lowery first disclosed her relationship with Hubbard in May 2013, when they were discussing the text messages Hubbard sent to Franklin explaining that he loved and wanted to marry her. Doc. 64-3 at 13–14. Misty Franklin contacted the Chilton County Sheriff's Office. Doc. 64-3 at 14. She also asked a friend for advice, and the friend told her to contact the Board of Education and speak to the superintendent. Doc. 64-3 at 14. Misty called the superintendent multiple times but he

---

[3] The record reflects some confusion over whether these events occurred in 2012 or 2013, but Misty Franklin confirmed in her deposition that the interactions between Franklin and Hubbard lasted from 2012 to 2014. Doc. 64-3 at 8 & 11–12.

6

never returned her calls. Doc. 64-3 at 10 & 15. Following the text messages in May 2013, Misty was not aware of any inappropriate conduct between Hubbard and Franklin until an investigator visited her home on July 24, 2014. Doc. 64-3 at 17. When Misty called the superintendent, she asked to speak with him and left a message with the receptionist for him to call her back, but did not explain the purpose of her call or provide any other information because she "didn't want to, you know, let everyone know of what was going on because this is my child that I'm trying to protect from someone like this." Doc. 64-3 at 10. She did not attempt to contact anyone else at the Board of Education. Doc. 64-3 at 11.

Willie Mae White, an assistant superintendent and personnel director for the Board of Education, testified that as a deputy sheriff Hubbard was "the contact person if there were an issue that would come up maybe where we needed some guidance from the Sheriff's Department to assist us in any manner where we might need some guidance from the Sheriff's Department or the Police Department." Doc. 64-4 at 4. According to Hubbard's personnel file, the Board hired him on July 17, 2013 to be a part-time instructor at LeCroy. Doc. 64-4 at 8. This was the only time Hubbard was employed by the Board, and his employment lasted for one year until the superintendent recommended his termination. Doc. 64-4 at 8. The Board did not investigate any wrongdoing by Hubbard, and did not learn about the plaintiffs' allegations against him until July 2014. Doc. 64-4 at 8–9. The criminal investigation was conducted by the Chilton County Sheriff's Office. Doc. 64-4 at 12.

According to White, the Board's procedure for responding to complaints of employee misconduct during the time period in question was to "look at the facts given to

7

substantiate the accuracy or maybe the meat of what has been reported to the Board." Doc. 64-4 at 11. If the Board received a telephone tip about inappropriate conduct by an employee toward a student, it would first contact the school's principal or assistant principal and then conduct an investigation. Doc. 64-4 at 11. If a receptionist received the tip, he or she would contact the superintendent, assistant superintendent, or personnel director. Doc. 64-4 at 11. The calls were not officially documented. Doc. 64-4 at 11. According to White, the Board would have contacted the Sheriff's Office if it received a tip about an officer who worked at one of its schools who was an employee of the Sheriff's Office and not the Board. Doc. 64-4 at 12. The Board also would have requested that the Sheriff's Office terminate the officer's duties at the school. Doc. 64-4 at 12.

## II. DISCUSSION

### A. Federal Claims

Boards of education cannot be held liable for constitutional violations based on a theory of *respondeat superior* liability. *See Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1263 (11th Cir. 2010). Rather, to establish § 1983 liability, a plaintiff must identify a governmental policy or custom that is the "moving force" behind the violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94 (1978). A plaintiff can demonstrate a policy or custom in two ways: by identifying either "(1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003).

> Under either avenue, a plaintiff (1) must show that the local governmental entity . . . has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue.

*Id.*

Here, the plaintiffs' § 1983 claim against the Board is based on the superintendent's failure to return Misty Franklin's phone calls in May 2013, which is alleged to have resulted from a policy or custom "that when the Board would receive a call alleging inappropriate teacher/student relations that the Board had no official documentation or [ledger] of those phone calls." Doc. 67 at 4. Following this theory to its logical conclusion, the plaintiffs argue that if the superintendent returned Misty's phone calls he would have learned about the allegations of Hubbard's sexual relationship with Lowery and inappropriate text messages with Franklin, and the Board then would have intervened, preventing Hubbard and his wife from sexually abusing Franklin from December 2013 to February 2014. That this intervention did not occur is regrettable, but the plaintiffs' claim is legally deficient.

Even assuming the evidence viewed in the light most favorable to the nonmovant supports the existence of an unofficial custom of deficient documentation of misconduct calls, that custom has no bearing on the plaintiff's claims for the simple reason that Misty Franklin, by her own admission, never told any Board employee why she was calling the superintendent. As a result, there is no evidence in the record on which the court could find that the purported policy or custom caused the constitutional violation at issue, particularly where the plaintiffs have not shown that the Board had any other reason to be aware of Hubbard's conduct. Under these circumstances, the Board's policy for handling

9

misconduct allegations does not come into play. Absent any evidence of a policy or custom of the Board that contributed to a constitutional violation, summary judgment is due to be granted in the Board's favor on the plaintiffs' § 1983 claim.

**B.     State-Law Claims**

The plaintiff's state-law claims against the Board must fail because the Board is immune under the Alabama Constitution against these claims. Article I, Section 14 of the Alabama Constitution provides "[t]hat the State of Alabama shall not be made a defendant in any court of law or equity." Article I, § 14, Ala. Const. "County boards of education, as local agencies of the State, enjoy this immunity." *Louviere v. Mobile Cnty. Bd. of Educ.*, 670 So. 2d 873, 877 (Ala. 1995). In their summary-judgment response, the plaintiffs failed to present any argument against the Board's claim of immunity, abandoning these claims. Even if they have not been abandoned, summary judgment is due to be granted on the plaintiffs' state-law claims against the Board.

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that the motion for summary judgment (Doc. 64) is GRANTED, and all claims asserted by Plaintiffs Paula Franklin and Haleigh Lowery against the Chilton County Board of Education are DISMISSED with prejudice. Judgement is ENTERED in favor of the Chilton County Board of Education on all claims asserted by Plaintiffs. This case is not closed.

DONE this 29th day of August, 2018.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE